*Postea* to the defendants.

## Post and Russell *against* Robertson.

In an action of *covenant* on a *charter-party;* the vessel was chartered for a voyage from New-York to St. Lucia, and back to New-York, for the entire sum of 2750 dollars, 1800 dollars of which sum was to be paid on the delivery of the outward cargo, the residue on the delivery of the homeward cargo. The vessel on her return, having performed about 3-4ths of her voyage homeward, met with an accident, which induced the master and crew to abandon her. She was afterwards taken possession of by the crew of another vessel, and brought into New-York, where she was libelled for *salvage,* and restored on payment of half the proceeds, the cargo having been sold by order of the court; the other half of the proceeds was paid to the owner of the goods. *Held* that this was not such a delivery of the cargo, as would entitle the plaintiffs to maintain an action on the *charter-party.* *Quere,* whether, in an action of *assumpsit,* they could recover any portion of the freight?

THIS was an action of covenant on a charter-party dated the 4th day of August 1803, between the plaintiffs, as agents for the owners of the brig *Jefferson,* and the defendants, by which the plaintiffs granted, and let to freight to the defendant, the said brig, for a voyage from the port of New-York to the island of St. Lucia, and back again to New-York. On the part of the plaintiffs, it was covenanted, that the vessel should be ready and proceed on her voyage, and deliver the cargo, to be put on board by the defendant, to him, or his factors, or agents at St. Lucia, &c. and receive and bring back a return cargo, and deliver the same at New-York, to the defendant, or his agents. The defendant, on his part, covenanted to load the vessel with a cargo, &c. (in the usual form) and further, to pay the plaintiffs for the charter of the vessel, the sum of two thousand, seven hundred and fifty dollars. It was also agreed in the charter-party, that, on delivery of the outward cargo at St. Lucia, the sum of eighteen hundred dollars should be considered as earned and due, and that a draft for that sum, should be given by the consignee to the plaintiffs or their agent, at sixty days, and be accepted by the defendant, and that the residue, or nine hundred and fifty dollars, should be paid on the return of the vessel to New-York and the delivery of the cargo there.

The cause was tried on the 15th day of December 1804, at the New-York *sittings,* before Mr. Justice *Tompkins,* when the jury found a verdict for the plaintiffs, for one thousand and twenty dollars and seventy-four cents, subject to the opinion of the court on a case, in which the above facts are stated.—It was also stated, that the vessel received, and

delivered the outward cargo at St. Lucia, and that the draft for eighteen hundred dollars was delivered to the plaintiffs, and afterwards paid by the defendant, according to his stipulation; that the brig duly received on board her return cargo, consisting of sugars, and proceeded on her homeward voyage, towards New-York; that, after prosecuting about three-fourths of the distance of the return voyage, and while on the high seas, she was run against in the night of the 9th of November 1803, by a vessel, by which the *Jefferson* received much damage in her hull, masts, spars, and rigging, but did not leak. In this situation she was overtaken by the schooner *William*, bound for New-York, on board of which vessel, the master and crew of the *Jefferson* were taken.

The master of the *William*, in his testimony given on the trial, was of opinion, considering the exhausted condition of the crew of the *Jefferson*, and her situation, that they were right in leaving her, but he added, that he offered to stay by, and assist the master and crew, if they would go on board again, which they refused. Four of the crew of the *William*, however, went on board the *Jefferson*, and safely navigated her into the port of New-York, with the return cargo, after a passage of eighteen days, from the time they took possession of her. The four seamen libelled the vessel and cargo in the district court in New-York, for *salvage*, and the cargo, consisting of eighty-three hogsheads of sugar, was sold pursuant to a decree of the court. Eighty hogsheads of the sugar were claimed by the defendant, for himself, and one James Brown, as consignees. Pursuant to the same decree of the court, one half of the net proceeds of the eighty hogsheads of sugar, amounting to two thousand, nine hundred and twenty-six dollars, and forty-eight cents, was paid to the libellants, for *salvage*, and the other half to the defendant, as the claimant.

It was agreed, that if the court should be of opinion, that the plaintiffs were entitled to recover the whole freight, for the voyage from St. Lucia to New-York, according to the charter-party, then the verdict should stand, and judgment

Vol. I.         E

be entered thereon. But if the court should be of opinion that the plaintiffs were entitled to receive a portion of the freight, less than the whole, then the amount of the verdict was to be reduced accordingly. Or, if the plaintiffs ought not to recover any part of the return freight in any form of action, then judgment was to be entered for the defendant; but if the court should be of opinion that the plaintiffs were entitled to recover, but not under the present form of action, then judgment of nonsuit was to be entered.

This cause was argued at the last November Term, by *Riggs* for the plaintiffs, and *T. L. Ogden* for the defendant.

The points raised by the plaintiffs, for the consideration of the court were, 1. That the arrival and delivery of the return cargo, in good order, at New-York, entitled the plaintiffs to the whole of the return freight. 2. If not to the whole, they were entitled to a moiety at least, as a moiety of the cargo had come to the use of the defendant. 3. The right of the plaintiffs to recover, either for the whole, or a part, of the freight, rests on the charter-party, and that under the circumstances of the case, the present was the proper form of action.

THOMPSON, J. This is an action of *covenant* upon a *charter-party*, and one of the questions arising from the case, is, whether, under the circumstances stated, the plaintiffs can recover, if at all, in this form of action? From a view of the facts, stated in the case, I think the plaintiffs' remedy for freight is not upon the charter-party. The contract of affreightment is an entire contract; and the general rule is, that unless it be entirely performed, by a delivery of the goods at the place of destination, no freight is due. (*Abbott*, 224) This is the rule, I apprehend, however, only where the ship is chartered for a specific sum, for the voyage, as in the case before us. In such case the general rule is, that if part of the cargo be lost by perils of the sea, and part conveyed to the place of destination, there can be no apportionment of the freight, under the charter-party. *Abbott*, 244. " The cases " in which a partial payment may be claimed, are exceptions

" to the general rule, founded on principles of equity, and " justice, as applicable to particular circumstances." *Abbott*, 224. According to the terms of the charter, the freight is made payable on the delivery of the cargo. The delivery, therefore, is a condition precedent. And where a contract is entire, and the promise to pay depends on a condition precedent, to be performed by the other party, such condition must be performed before the other party is entitled to receive any thing. 6 *D.* & *E. Rep.* 324.* The case of *Cook* v. *Jennings*, 7 *D.* & *E. Rep.* 381, expressly decides, that when an accident has happened to the ship, and the goods are accepted at an intermediate port, covenant will not lie on the charter-party; but it must be a special action on the case, founded on the implied *assumpsit*, arising from the acceptance of the goods. (See also, *Bright* v. *Cowper*, 1 *Brownlow*, 21. and *Clarke* v. *Gurnell*, 1 *Buls.* 167.) I am inclined to think that the plaintiffs are entitled to recover some freight, and that this ought to be in proportion to the amount of the goods received; because, the right to freight arises altogether from the acceptance of the cargo, which raises an implied promise to pay. This was the rule adopted in the case of *Luke* v. *Lyde*, 2 *Burr.* 882.* Nor can any thing be more consonant to principles of justice and equity. It is observable, also, that though it does not appear from the report in *Burrow*, what was the form of action; yet in the case of *Cook* and *Jennings*, Lord Kenyon states it to have been been a *general assumpsit*, for the freight of goods, founded on an implied contract. In the case of *Luke* v. *Lyde*, Lord Mansfield said, when the vessel is captured, and recaptured, and the salvage taken out, such part is deemed lost, and no freight payable for that; freight is only payable for the other half. It is a settled principle, that when a ship becomes accidentally disabled to prosecute the voyage, and the shipper accepts his goods, at any intermediate port, a *pro rata* freight is payable. I see no reason why the same rule should not be adopted, when a part of the goods are accepted at the place of destination. Nor can it make any difference in principle, whether it be the goods themselves or the proceeds thereof,

*margin notes:* * *Cutter* v. *Powel.*  * 1 *Black.* 190. S. C.

Post & Russell
v.
Robertson.

which are thus accepted, according to the case of *Baillie* v. *Moudigliani, Park,* 53. But, as it appears to me, the present is not the form of action applicable to the case, my opinion is, that judgment of nonsuit must be entered.

We cannot, I think, undertake to decide with respect to the conduct of the master and crew, in abandoning the vessel. This was a question which ought to have been submitted to the jury.

KENT, C. J. SPENCER, J. and TOMPKINS, J. were of the same opinion.

LIVINGSTON, J. Whether the plaintiffs be entitled to the whole, or any portion of freight for the voyage from St. Lucia to New-York, and if they are, whether it can be recovered in an action on the charter-party, are the questions to which the facts before us give rise.

When we look into the contract, we perceive that payment of freight was, by mutual agreement, to depend " on the Jef-" ferson's return to New-York, and *a delivery of the cargo*." Notwithstanding this express stipulation, ratified with all the solemnity which is supposed to attend the execution of an instrument under seal, the defendant is applied to for freight, although no part of the goods has been received, owing not to his fault, or refusal to take them, but to one of the perils, which excused a delivery altogether. Were we sitting here to make, not to expound, and enforce contracts, it is possible we might contrive some relief for the plaintiffs ; but having themselves agreed to ask no compensation, unless in the event of a delivery of the cargo, there can be no hardship in restricting them to terms of their own imposing, which very properly constitute a condition precedent in almost every charter-party. If the plaintiffs had been sued for not delivering the cargo, they would have found, in the terms of the contract, (the dangers of the sea being excepted) a valid defence. Why then should not the same instrument be alone resorted to, in determining the defendant's responsibility ? But he received a moiety of the net proceeds, and therefore, it is contended, is liable to pay at least one half of the freight. Without recurrence to authorities, let

us see whether this be reasonable. The proceeds were receiv-
ed about *two months* after the vessel's arrival at New-York,
and after a sale at auction, which is generally attended with
sacrifice. What the charges were in consequence of the libel,
or what the property would have sold for on its landing,
does not appear. Now, unless taking the price in this way,
be always, and in every respect, equivalent to a receipt of the
merchandize itself, this act of the defendant, which was a
thing not of volition, but of necessity, can form no just cri-
terion in judging of his liability. The sugars may have been
intended for exportation, and the price of some foreign mar-
ket may have been the only inducement to their shipment.
This object, which we have a right to suppose was contem-
plated, has been entirely frustrated. The party may have
been under contract to deliver them here, in which also he
must have been disappointed : at any rate, he had an obvious
interest in disposing of them in his own way, and on his own
terms, and even this was not in his power. It is impos-
sible, therefore, under any view of this question, to consider
a proportion of the net proceeds, cast upon him in this way,
as beneficial, as a timely and prompt possession of the goods
themselves. Neither in fact, nor in contemplation of the
parties, could it be so. No man in his senses would have
agreed to pay freight under such circumstances. Nor can
any argument be drawn, or *new* promise implied, from this
act of the defendant. What was he to do ? The perils of the
sea had prevented a compliance on the part of the owners of
the ship ; against them, therefore, he had no recourse. It
was his duty, then, to rescue as much of the property as he
could from the jeopardy which had intervened. Whether
he was acting for himself, or as an agent for underwriters, or
for any one else, the claim he filed being a thing of necessity,
should not prejudice, or involve him in any new, or implied
engagements with those whose charter-party was dissolved
from the moment the vessel was abandoned.

It is, however, imagined, that this case is within the rea-
soning of certain decisions, allowing a freight *pro rata iti-*
*neris.* If courts had not undertaken, on grounds of sup-

ALBANY,
Feb. 1806.

Post & Russell
v.
Robertson.

posed hardship, to interfere with contracts, which always proceed on an estimate of the very interruptions which have induced these interpositions, the construction of a charter-party would have been liable to no uncertainty. At present, however explicit and intelligible its terms may be, and, however well the parties may have understood each other, is difficult to know when freight is earned or not. It is in vain for the shipper to say to the master, or his owner, " you have not complied with the terms of your agreement ; " you have not carried my goods to the port of destination ; " on the contrary, you have landed them further off than " when put on board, and, therefore, you are entitled to nothing." Though it be not denied that such was the bargain, and clear intention of the parties ; yet if, rather than let the goods perish, the merchant receives them, be it ever so distant from their port ; and, though, instead of being benefited, he may have received an irreparable injury, by the inability of the vessel to proceed, and would not on any consideration have shipped them, could he have foreseen the disaster, he must submit to pay a proportional freight in the very face of his agreement. However equitable this apportionment may appear, it will generally work injustice to the owner of goods. He may receive them at a port from which exportation is altogether impracticable, or very expensive, and may thus be forced to sell them at great loss, or be exposed to a second freight greater than the first, without having any remedy for the injury he has sustained.

If the master offer to repair his vessel, and to hire another, and the merchant insists on having his goods, then, and perhaps, in that case only, should freight, and a full freight be allowed. It is on this principle, that Lord Mansfield seems to have proceeded in the case of *Luke* v. *Lyde.* Perhaps, however, it was going too far to consider the merchant's not desiring the master to provide another ship, as equivalent to an offer on the part of the latter, to carry the goods to their port of destination. Though the present case does not resemble the one just mentioned ; yet, as it has been cited, and is an authority as far as it goes, I cannot avoid observing, that to me it has ever appeared a very hard deci-

sion against the defendant. There was not only a total end
of the voyage to Lisbon, by reason of the capture and re-
capture, but the cargo was carried to a market it did not
suit, and for which it was not intended; a freight too,
larger than the original sum agreed to be paid, was incur-
red to get it to Spain, and that after an immense salvage
had been paid to the recaptors. What benefit, it may be
asked, was done to Lyde by carrying his goods within sight
of Lisbon, if, after all, they did not, and could not get there?
If all these circumstances did not produce a dissolution of
the charter-party, what is to have that effect? If *Lyde* had
taken his goods out of the hands of the master, there might
be some reason for adding to his other misfortunes, that of
the payment of freight; but receiving them of the salvors in
preference to a total dereliction, could never form the basis
of a claim on the part of one, who had *entirely* failed in his
contract, which was to *carry* them to *Lisbon.* It was a de-
mand, sanctioned neither by the contract, nor any one
principle of justice. How the form of action, for it was a
*general assumpsit* for freight, could vary the essential rights
of the parties, is equally incomprehensible; for as Lord
Kenyon observes, in remarking on this decision, which it
is very evident did not meet his approbation, " what has
the case of an implied, to do with an express contract?" *Ex-*
*pressum facit cessare tacitum.* It may be added, what have
the Rhodian laws, or the regulations in the *Consolato del*
*mare,* or the laws of Wisbuy, or the ordinances of Lewis
the 14th, on which lord Mansfield so much relied, to do
with a plain and positive agreement between two merchants?
They had a right, notwithstanding all such regulations,
(which, if examined will not be found to support the doc-
trine laid down in *Luke* v. *Lyde*) to agree, that no freight
should be paid, but on a completion of the voyage and *deli-*
*very* of the cargo. To interpret a charter-party made be-
tween two British subjects, by French ordinances, or by the
municipal regulations of any other state, isnot less extrava-
gant, than it would be, in the parliament of Paris, to declare
a contract made in France, and valid by her laws, null and

ALBANY,
Feb. 1806.

Post & Russell
v.
Robertson.

void, because the parties had not conformed to the English statute for the prevention of frauds and perjuries. If an agreement contravene no law of the state, whereof the parties are subjects, and where it is made, that alone should be a guide in ascertaining their respective rights. The regulation of freight is as much an affair of municipal interference, and of private contract, as any other. There is no such thing as a law of nations on the subject; for every power legislates on this, as well as on other matters, as it thinks best. I have ventured to express my disapprobation of the principles of this decision, as a reason for not applying them to any other case in which can be discerned the smallest shade of difference. The more we confine ourselves to the agreement of parties, the less injustice will be done. We may be assured that they understood themselves, and would have provided for the payment of freight, in case of accidents like the present, if they had intended that any thing, short of a delivery, should have subjected the defendant to this charge. It has already been noticed how important, in most instances, it must be, to receive the goods themselves, and that we have, therefore, no right to say, that a moiety of the proceeds from a forced sale, and after various deductions, is as advantageous as the delivery of the article itself. Thus far, then, the case is not governed by that of *Luke v. Lyde* In that case, a part of the goods were received; in this, only a part of the proceeds. Lord Mansfield, it is true, in *Baillie* v. *Moudigliani*,* says, that the " value of goods being restored in money, is the " the same as the goods, and, therefore, freight was certainly due *pro rata itineris*." But that case is since the revolution, and the only point in it was, whether the underwriters on goods were liable to their owner for the freight they had paid. In *Lutwidge* and another v. *Gray*,† there appears to have been an offer to provide another ship; when that is refused, there can be no hardship in making the party pay freight.

In *Blight* and others v. *Page*,‡ lord Kenyon only determined, that if a merchant will covenant to load a ship, which

* Park 53.

† Abbott 250.

‡ 3 B. & P. 295, in *note*.

becomes impossible by an act of government, he shall, notwithstanding, pay freight on the ground, that if he will undertake what he cannot perform, he shall answer to the party with whom he engages. I perceive no analogy between that case and the one before us. The owner of the vessel was ready to receive a cargo, and the merchant was considered in default. In one view that case is favorable to the defendant, for it shews how strictly the merchant was held to pay, though he could not perform what he had promised. If we test the plaintiffs' claims by the same rule, what will become of them? They covenanted to *deliver the goods at New-York;* they have not done it, and yet ask payment. At this rate, the merchant contracts on very unequal terms. If he cannot get a cargo, he must, nevertheless, pay freight, and if he obtains one, and the master is obliged to leave it by the way, even on a desart island, he must, if he, or his agent touch the goods, also pay freight, though it may, afterwards, cost him ten times as much as the first sum he was to pay, to get them to their port. We cannot, then, without violating the plainest rules of law, without annulling a solemn and reasonable contract of the parties, and without manifest injustice to the defendant, say that any thing is due for freight, from St. Lucia to New-York.

It cannot be necessary, after being thus explicit as to the rights of the parties, to say any thing of the form of action. Nothing short of a delivery of the cargo at New-York, or some act which in law is equivalent, can be the foundation of an action on an instrument, which, on its very face, renders such delivery a condition precedent to payment. What fell from lord Kenyon, in *Cook* v. *Jennings,*§ must convince every one that freight, if any were due under the circumstances here disclosed, cannot be recovered in a suit on the charter-party. If I am right, it cannot be recovered in any way, and the defendant ought, therefore, to have judgment.

Judgment of nonsuit.